**ALLEN & OVERY LLP**
Daniel J. Guyder
Christopher R. Newcomb
Joseph Badtke-Berkow
Jacob R. Herz
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 610-6300
Facsimile: (212) 610-6399

*Attorneys for the Aircraft*
*Finance Insurance Consortium Insurers*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Voyager Aviation Holdings, LLC *et al.*,<br><br>            Debtors.[1] | Chapter 11<br><br>Case No. 23-11177 (JPM)<br><br>(Jointly Administered)<br><br>Related [Dkt. Nos. 42, 43] |

**AIRCRAFT FINANCE INSURANCE CONSORTIUM INSURERS' OBJECTION
TO MOTION OF VOYAGER AVIATION HOLDINGS, LLC AND OTHER PARTICIPATION
ASSETS DEBTORS FOR ENTRY OF ORDER, PURSUANT TO 11 U.S.C. §§ 363(B), 363(F)
AND 365(A) (I) AUTHORIZING ASSUMPTION OF PARTICIPATION AGREEMENT AND
RELATED TRANSACTIONS, (II) AUTHORIZING SALE OF PARTICIPATION INTERESTS
AND RELATED TRANSACTIONS, (III) APPROVING LIQUIDATED DAMAGES IF
PARTICIPATION ASSETS ARE SOLD TO ANY OTHER PERSON
OR ENTITY AND (IV) GRANTING RELATED RELIEF**

---

[1]        The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Voyager Aviation Holdings, LLC (8601); A330 MSN 1432 Limited (N/A); A330 MSN 1579 Limited (N/A); Aetios Aviation Leasing 1 Limited (N/A); Aetios Aviation Leasing 2 Limited (N/A); Cayenne Aviation LLC (9861); Cayenne Aviation MSN 1123 Limited (N/A); Cayenne Aviation MSN 1135 Limited (N/A); DPM Investment LLC (5087); Intrepid Aviation Leasing, LLC (N/A); N116NT Trust (N/A); Panamera Aviation Leasing IV Limited (N/A); Panamera Aviation Leasing VI Limited (N/A); Panamera Aviation Leasing XI Limited (N/A); Panamera Aviation Leasing XII Designated Activity Company (N/A); Panamera Aviation Leasing XIII Designated Activity Company (N/A); Voyager Aircraft Leasing, LLC (2925); Voyager Aviation Aircraft Leasing, LLC (3865); Voyager Aviation Management Ireland Designated Activity Company (N/A); and Voyager Finance Co. (9652). The service address for each of the Debtors in these cases is 301 Tresser Boulevard, Suite 602, Stamford, CT 06901.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

RELEVANT BACKGROUND .............................................................................................. 4

    A.      The Aircraft and the Secured Facilities ..................................................... 4

    B.      The Leasing Arrangements.......................................................................... 6

    C.      Non-Payment Insurance Underwritten by the AFIC Insurers ................... 6

    D.      Aircraft Insurance ...................................................................................... 7

      i.     Operator's Insurance ............................................................................ 7

      ii.    Contingent Insurance ........................................................................... 7

    E.      The Total Loss of the Aircraft and the UK Insurance Litigation .............. 8

    F.      Aircraft Engine Located in Taiwan ........................................................... 9

    G.      The Chapter 11 Cases and the Plan ........................................................... 10

    H.      The Participation Agreement and the Motion .......................................... 11

      i.     The Participation Agreement................................................................ 11

      ii.    The Motion and the P.A. Debtors' Pre-Petition Marketing and Sale Efforts........... 15

OBJECTION........................................................................................................................ 17

      I.     The Motion Is Premature and the P.A. Debtors' Assumption of the
             Participation Agreement Is Not a Valid Exercise of Their Business Judgment....... 17

      II.    The Sale of the Participation Assets Does Not Satisfy the Requirements of
             Sections 363(f) and 363(k) of the Bankruptcy Code ................................ 19

      III.   The Secured Parties' Interests Are Not Adequately Protected ................ 21

      IV.   The $2.5 Million Penalty Should Not Be Approved; It Is Not Akin to Bidder
             Protections ................................................................................................. 26

      V.    The Proposed Order Requires Certain Clarifications/Additions ............. 29

      VI.   Request for Adequate Protection .............................................................. 30

RESERVATION OF RIGHTS ............................................................................................. 30

CONCLUSION.................................................................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aéropostale, Inc.*,
  555 B.R. 369 (Bank. S.D.N.Y. 2016) ......................................................................20

*In re Balco Equities Ltd., Inc.* ,
  312 B.R. 734 (Bankr. S.D.N.Y. 2004) ....................................................................22

*In re Dewey Ranch Hockey, LLC*,
  414 B.R. 577 (Bankr. D. Ariz. 2009) .....................................................................21

*Elmira Litho, Inc.*,
  174 B.R. 892 (Bankr. S.D.N.Y. 1994) ....................................................................25

*In re Flour City Bagels, LLC*,
  *557* B.R. 53 (Bankr. W.D.N.Y. 2016) ...................................................................29

*In re Lavigne*,
  114 F.3d 379 (2d Cir 1997).....................................................................................26

*In re Metromedia Fiber Network, Inc.*,
  290 B.R. 487 (Bankr. S.D.N.Y. 2003).....................................................................21

*In re MF Glob. Holdings Ltd.*,
  466 B.R. 239 (Bankr. S.D.N.Y. 2012) .....................................................................18

*In re Mosello*,
  195 B.R. 277 (Bankr. S.D.N.Y 1996) ......................................................................24

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*,
  4 F.3d 1095 (2d Cir. 1993).......................................................................................17

*In re Penn Traffic Co.*,
  524 F.3d 373 (2d Cir. 2008).....................................................................................17

*In re RML Development, Inc.*,
  528 B.R. 150 (Bankr. W.D. Tenn. 2014) ................................................................20

*Rocco v J.P. Morgan Chase Bank*,
  255 F. App'x 638 (3d Cir. 2007) .............................................................................24

*Sonnax Indus., Inc. v. Tri Component Prod. Corp. (In re Sonnax Indus., Inc.)*,
  907 F.2d 1280 (2d Cir.1990).....................................................................................21

*In re Times Sq. JV LLC*,
    648 B.R. 277 (Bankr. S.D.N.Y. 2023) ...........................................................................17

*Trustees of Columbia University in City of New York v. D'Agostino Supermarkets,
    Inc.*,
    36 N.Y. 3d 69 (2020) ....................................................................................................28

*In re Turner*,
    326 B.R. 563 (Bankr. W.D. Pa. 2005) .........................................................................24

*In re Wythe Berry Fee Owner LLC*,
    22-11340 (MG), 2023 WL 2483427 (Bankr. S.D.N.Y. Mar. 13, 2023) ..................21

*In re YL W. 87th Holdings I LLC*,
    423 B.R. 421 (Bankr. S.D.N.Y. 2010) .........................................................................21

*In re Ziegler*,
    88 B.R. 67 (Bankr. E.D. Pa. 1988) ..............................................................................24

**Statutes**

11 U.S.C. § 361 ......................................................................................................................21

11 U.S.C. § 362(d) ..................................................................................................................21

11 U.S.C. § 363 ....................................................................................................3, 18, 19, 23, 26

11 U.S.C. § 363(e) .......................................................................................................20, 21, 26, 30

11 U.S.C. § 363(f) ..............................................................................................................19, 20

11 U.S.C. § 363(k) ........................................................................................................19, 20, 23, 27

11 U.S.C. § 1129 .................................................................................................................3, 18

11 U.S.C. § 1129(b) ................................................................................................................10

11 U.S.C. § 507(a)(2) ..............................................................................................................14

11 U.S.C. § 503(b) ..................................................................................................................14

**Other Authorities**

3 Collier on Bankruptcy P 363.02 (16th ed. 2023) .......................................................26

The Aircraft Finance Insurance Consortium insurers (the "AFIC Insurers"), by and through their undersigned counsel, hereby submit their objection (this "Objection") to the *Motion of Voyager Aviation Holdings, LLC and Other Participation Assets Debtors for Entry of an Order, Pursuant to 11 U.S.C. §§ 363(h), 363(f) and 365(a), (i) Authorizing Assumption of Participation Agreement and Related Transactions, (ii) Authorizing Sale of Participation Interests and Related Transactions, (iii) Approving Liquidated Damages If Participation Assets Are Sold to Any Other Person or Entity and (iv) Granting Related Relief* [Dkt. No. 42] (the "Motion") filed by the P.A. Debtors[1] on August 3, 2023. In support of this Objection, the AFIC Insurers submit and incorporate herein by reference the *Declaration of Henning Sohnemann* dated September 5, 2023 (the "AFIC Declaration"), filed contemporaneously herewith, and respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      The AFIC Insurers are the controlling stakeholders in respect of senior secured facilities to which certain P.A. Debtors are parties as borrowers, guarantors and/or security providers and pursuant to which the secured parties thereunder are owed in excess of $125.7 million. The P.A. Debtors' obligations under the facilities are secured on a first priority basis by their interests in two Boeing 747-8F freighter aircraft, associated engines, parts and equipment, and certain leasing and other contract rights, including insurances—and reinsurances—related to the two aircraft and the proceeds thereof.

2.      The insurance collateral here is critical to the AFIC Insurers' recovery because both of the aircraft have been lost in Russia, where they were being leased to a Russia-based freight carrier, as a result of Russia's war on Ukraine and the resulting international sanctions imposed on Russia. Consequently, there are no cash flows from the leasing of the aircraft and certain of the

---

[1]      Capitalized terms used but not defined herein have the meanings given to them in the Motion.

1

P.A. Debtors are named plaintiffs in litigation against insurance carriers to realize upon the insurance collateral due to the total loss of the aircraft.

3.      By the Motion and the proposed immediate assumption of the Participation Agreement, the P.A. Debtors seek to abdicate their responsibilities with respect to the secured parties' collateral, including the insurance claims, and ultimately transfer it to third-party Azorra Explorer Holdings Limited ("Azorra"), initially by way of a participation but with a right—at Azorra's sole election—to "elevate" such participation into an absolute sale and assignment of the collateral. The secured parties, acting at the AFIC Insurers' direction, would have no opportunity to "credit bid" their claims in connection with this sale of their collateral and the Participation Agreement would in effect vest in Azorra a free option to capture potential surplus recoveries—if any—that may result from the prosecution of pending and future insurance litigation. While Azorra has agreed, as it must, that collateral recoveries must be paid first to the secured parties, it does not itself assume the obligation to pay the secured obligations.

4.      In return, the P.A. Debtors will receive nominal upfront consideration of $1.00 and the potential for a portion of any residual collateral proceeds that are not otherwise allocated to Azorra. Azorra, however, is under no obligation to take any particular action or provide any amount of funding in relation to the litigation and collateral recovery efforts and it is expressly authorized to act in its own interests without regard to those of the secured parties or the Debtors. Meanwhile, the P.A. Debtors have asserted that their entry into the Participation Agreement and the delegation of all authority with respect to the collateral to Azorra prevents them from sharing with the secured parties complete information about the collateral and efforts being taken to preserve and realize upon it. The P.A. Debtors do retain the right to pivot to an alternative transaction with respect to the secured parties' collateral, but the Participation Agreement imposes

a hefty $2.5 million penalty for doing so, which would be payable to Azorra as an administrative expense of the P.A. Debtors' estates.

5.      The P.A. Debtors recognize that they cannot consummate this extraordinary transaction without first obtaining the AFIC Insurers' consent. To be clear, however, there is ***no scenario*** in which the AFIC Insurers will consent to the participation in, or assignment of, the collateral as presently contemplated by the Participation Agreement. As such, the P.A. Debtors' proposed assumption of the Participation Agreement at this early stage is ill-conceived and will needlessly burden their estates with significant administrative expenses, raising the specter that certain of the P.A. Debtors may be rendered administratively insolvent. As of the date hereof, the AFIC Insurers have engaged in extensive discussions with the P.A. Debtors and Azorra to see if there is scope for an agreement that would involve Azorra's participation in the collateral recovery efforts. However, the parties have been unable to reach such an agreement. Reaching an agreement with the AFIC Insurers is essential. Absent such agreement, the P.A. Debtors must—inevitably— turn to either disposing of their interests in the collateral under sections 363 or 1129 of the Bankruptcy Code or outside the strictures of the bankruptcy process through an AFIC Insurer-led foreclosure. In these circumstances, there is no legitimate basis to agree to a $2.5 million penalty that the P.A. Debtors are all but certain to pay.

6.      To the extent the P.A. Debtors assert that they should be authorized to enter into the participation and sale transactions as presently contemplated by the Participation Agreement— or by later amendment to the Participation Agreement—***without*** AFIC's consent, the Motion should be denied because the relief sought therein is impermissible under the Bankruptcy Code. The Participation Agreement contemplates the sale of the secured parties' collateral in a private sale to Azorra in return for *de minimis* consideration and without providing adequate protection of the secured parties'—and the AFIC Insurers'—interests in their collateral or complying with the

other strictures of section 363 of the Bankruptcy Code. In particular, the inability of the P.A. Debtors to secure a committed source of funding for the insurance litigation creates a high likelihood of a substantial or total loss of that collateral's value. Further, the secured parties are afforded no opportunity to exercise their statutory rights to credit bid their claims in connection with the sale of their collateral if Azorra exercises its so-called "elevation" option. Thus, notwithstanding that they are the parties at risk of suffering first losses in excess of $125.7 million, the AFIC Insurers would be deprived of any ability to direct the secured parties to foreclose on, and potentially acquire, the collateral so as to be in a position to direct prosecution of pending and future insurance litigation. This outcome is particularly egregious here as it is clear that the P.A. Debtors have no equity in the collateral, including the claims under the insurance policies, as evidenced by their self-described exhaustive pre-petition marketing efforts that resulted in no bids for the debtors' interests in the collateral in excess of the secured obligations.

7.      At bottom, the Participation Agreement does little more than allow the Voyager Debtors to retain the potential, speculative upside of the insurance claims while the secured parties are deprived of their rights and bear all of the risk, all without justification and contrary to the requirements of the Bankruptcy Code. For the foregoing reasons and those set forth below, the AFIC Insurers respectfully request that the Court sustain this Objection and deny the Motion.

## RELEVANT BACKGROUND

### A.    The Aircraft and the Secured Facilities[2]

8.      P.A. Debtor Panamera XII owns and leases, together with all related engines, parts and equipment, a Boeing 747-8F freighter aircraft bearing manufacturer's serial number 63695 ("MSN 63695"). See AFIC Decl. ¶ 3.

---

[2]      Capitalized terms used but not defined in Section A of this Objection have the meanings given to them in the Participation Agreement.

9.      P.A. Debtor Panamera XIII (together with Panamera XII, the "Panamera Debtors")[3] owns and leases, together with all related engines, parts and equipment, a Boeing 747-8F freighter aircraft bearing manufacturer's serial number 63781 ("MSN 63781", and together with MSN 63695, the "Aircraft"). *Id.* ¶ 4.

10.     The Panamera Debtors and the Aetios Debtors were established for the sole purpose of entering into the financing and leasing arrangements in relation to the Aircraft as described herein and have no employees, no unencumbered assets, and no remaining business purpose other than to seek recovery from the Aircraft Insurances (as defined below). *Id.* ¶ 5.

11.     To finance their acquisition of the Aircraft, the Panamera Debtors and certain of the other P.A. Debtors entered into secured financing facilities with the Finance Parties (the "Facilities"). *Id.* ¶ 6. As described in greater detail in the Motion and the Participation Agreement, the Facilities were provided by the Finance Parties pursuant to the MSN 63695 Aircraft Financing Documents and the MSN 63781 Aircraft Financing Documents (together, the "Financing Documents"). The obligations of the P.A. Debtors to the Finance Parties under the Financing Documents (the "Secured Obligations") are secured by liens and security interests in certain assets of the P.A. Debtors (collectively, the "Collateral") granted to Wells Fargo Trust Company, National Association in its capacity as security trustee under the Financing Documents (the "Security Trustee") for the benefit of the Finance Parties pursuant to the Security Documents. The Collateral includes the Aircraft and the Insurance Claims (as defined below). *Id.*

12.     All of the Participation Assets—as defined in the Participation Agreement and discussed in greater detail below—form part of the Collateral. AFIC Decl. ¶ 7. The defined terms

---

[3]      Each of the Panamera Debtors is a bankruptcy remote special purpose vehicle organized under the laws of Ireland. Intertrust Nominees (Ireland) Limited, which is not an affiliate of the Debtors, is the parent and holds 100% of the equity of the Panamera Debtors.

"Participation Assets" and "Collateral" are used interchangeably in this Objection. The Finance Parties, acting at the direction of the AFIC Insurers through the Insurer Representative (as defined below), are referred to herein as the "Secured Parties."

13.     Debtor Voyager Aviation Holdings, LLC ("VAH") has guaranteed repayment of the Secured Obligations pursuant to: (i) the Guarantee dated as of September 29, 2017 (in respect of MSN 63695); and (ii) the Guarantee dated as of September 15, 2017 (in respect of MSN 63781) (together, the "VAH Guaranty"). *Id.* ¶ 8.

14.     As of the date hereof, the amount outstanding under the Facilities is not less than $125.7 million. *Id.* ¶ 9.

## B.    The Leasing Arrangements

15.     To generate revenue for their operations and repayment of the Secured Obligations, certain of the P.A. Debtors entered into leasing arrangements in respect of each of the Aircraft as follows (collectively, the "Leasing Arrangements"):

   a.   **MSN 63695 Leasing Arrangements**: Panamera XII leases MSN 63695 to Debtor Aetios 1 pursuant to the Second Amended and Restated Lease Agreement dated as of January 20, 2021. Aetios 1 subleases MSN 63695 to non-Debtor Chrystal Jet Limited ("Chrystal") pursuant to the Aircraft Lease Agreement, dated as of January 20, 2021, and Chrystal further subleases MSN 63695 to non-Debtor AirBridgeCargo Airlines LLC ("AirBridgeCargo"), an entity organized under the laws of Russia, pursuant to the Amended and Restated Lease Agreement dated as of January 20, 2021. *Id.* ¶ 10(a).

   b.   **MSN 63781 Leasing Arrangements**: Panamera XIII leases MSN 63781 to Debtor Aetios 2 pursuant to the Amended and Restated Lease Agreement dated as of December 3, 2020. Aetios 2 (together with Aetios 1, the "Aetios Debtors") subleases MSN 63695 to Chrystal pursuant to the Aircraft Lease Agreement dated as of December 3, 2020, and Chrystal in turn subleases MSN 63781 to AirBridgeCargo pursuant to the Amended and Restate Aircraft Lease Agreement dated as of December 3, 2020. *Id.* ¶ 10(b).

16.     Prior to Russia's invasion of Ukraine, AirBridgeCargo operated the Aircraft from Russia under the terms of the Leasing Arrangements. AFIC Decl. ¶ 11.

C.    **Non-Payment Insurance Underwritten by the AFIC Insurers**

17.    The AFIC Insurers are a group of insurers who have provided non-payment insurance in respect of principal and scheduled interest owing to the Secured Parties under the Facilities. Allianz Global Corporate & Specialty SE, UK acts as the insurer representative of the AFIC Insurers (the "Insurer Representative"). *Id.* ¶¶ 1, 12. As a result, the AFIC Insurers are the true economic interest holders with respect to the claims on account of the Secured Obligations against the P.A. Debtors. *Id.* ¶ 13. Further, the Insurer Representative has the right to instruct the other Secured Parties, including the Security Trustee, to exercise all remedies available to the Secured Parties under the Financing Documents, including the Security Documents, with respect to the Secured Obligations, including enforcing against the Collateral. *Id.*

D.    **Aircraft Insurance**

  i.    ***Operator's Insurance***

18.    As required in connection with the Leasing Arrangements, AirBridgeCargo as operator of the Aircraft obtained operator insurance policies from certain insurer(s) which were reinsured in the London and international markets (the "Operator's Insurances" and the "Operator's Insurers") in connection with its operation of the Aircraft. *Id.* ¶ 14. All of the P.A. Debtors' interests in the Operator's Insurances and claims against the Operator's Insurers have been assigned to the Secured Parties pursuant to the Security Documents. *Id.*

  ii.    ***Contingent Insurance***

19.    Debtor VAH has obtained from certain insurers (the "Contingent Insurers") so-called contingent insurances (the "Contingent Insurances", and together with the Operator's Insurances, the "Aircraft Insurances"), which provide cover in the event of physical loss or damage, or loss or damage, to the Aircraft. *Id.* ¶ 15. All of the interests of VAH, the Panamera Debtors and the Aetios Debtors in the Contingent Insurances and claims against the Contingent

7

Insurers in respect of the Aircraft have been assigned to the Secured Parties pursuant to the Security Documents. *Id.*

### E.    The Total Loss of the Aircraft and the UK Insurance Litigation

20.      On February 24, 2022, Russia invaded Ukraine, commencing a war that is ongoing. In compliance with the sanctions imposed on Russia as result of its actions in Ukraine, the P.A. Debtors took steps to cancel the Leasing Arrangements as of March 25, 2023, and made demands on AirBridgeCargo for the return of the Aircraft. *See Declaration of Robert A. Del Genio, Chief Restructuring Officer of Voyager Aviation Holdings, LLC, In Support of Chapter 11 Petitions and First Day Motion* [Dkt. No. 16] ("First Day Declaration") ¶  55; AFIC Decl. ¶ 16. Upon information and belief and as represented by the P.A. Debtors, to date AirBridgeCargo has failed to return the Aircraft. *Id.*

21.      The P.A. Debtors have asserted claims (the "Operator's Insurance Claims") against the Operator's Insurers under the Operator's Insurances as a result of the total loss of the Aircraft in Russia. AFIC Decl. ¶ 17. The Operator's Insurers have to date denied the Operator's Insurance Claims and on June 15, 2023, the P.A. Debtors commenced litigation (the "UK Insurance Litigation") in the Business and Property Courts of England and Wales (the "UK Court"), which remains pending as of the date hereof. *Id.* On information and belief, the P.A. Debtors must take actions in the UK Insurance Litigation in furtherance of their prosecution of the Operator's Insurance Claims. Recent activity in the UK Insurance Litigation included the filing of evidence in answer to the Operator's Insurers' challenge to the jurisdiction of the UK Court on August 25, 2023. *Id.* Failure to make that filing could have materially prejudiced the Operator's Insurance Claims.  *Id.*

22.      In addition to the Operator's Insurance Claims, on March 3, 2022, the P.A. Debtors notified the Contingent Insurers of claims under the Contingent Insurances (the "Other Insurance

Claims", and together with the Operator's Insurance Claims, the "Insurance Claims"). *Id*. ¶ 18. The Contingent Insurers have to date refused to confirm the claims under the Contingent Insurances. *Id.* As a result, litigation against the Contingent Insurers will be required in order to confirm insurance coverage in respect of the claims under the Contingent Insurances, which litigation the P.A. Debtors have so far been unwilling or unable to prosecute despite repeated efforts by the AFIC Insurers to impress upon the P.A. Debtors the need for action. *Id.*

**F.    Aircraft Engine Located in Taiwan**

23.    The AFIC Insurers understand that an engine associated with MSN 63781 (the "Engine"), which is included in the Collateral, was located at a repair shop in Taiwan (the "Taiwan Shop") at the time of the commencement of the Ukraine war and the cancellation of the Leasing Arrangements. *Id.* ¶ 19. The AFIC Insurers further understand that work on the Engine has been completed and that the costs of the repair, which may be in excess of $5 million, remain unpaid by the P.A. Debtors as of the date hereof. *Id*. As a result, the AFIC Insurers understand that the Engine remains subject to potential possessory liens securing obligations owing to the Taiwan shop or others. *Id*. In addition to unpaid repair costs, the AFIC Insurers also expect that the P.A. Debtors are incurring substantial costs in relation to the ongoing storage and preservation of the Engine in Taiwan and that there is a risk that, notwithstanding the imposition of the automatic stay, the Taiwan Shop takes steps to foreclose on any alleged liens in order to satisfy amounts owing to it from the P.A. Debtors. *Id*. The AFIC Insurers have repeatedly requested information regarding the status of the Engine and the P.A. Debtors' plans to pay all outstanding amounts owing to the Taiwan Shop in relation to the repair of the Engine. *Id*. Although the P.A. Debtors have provided certain information in response to those requests, the AFIC Insurers currently have limited visibility with respect to the maintenance and storage of the engine, a critical piece of the Collateral and the Debtors' proposed path forward for ensuring the engine is sold or recovered. *Id*.

9

23-11177-jpm    Doc 154    Filed 09/07/23    Entered 09/07/23 12:41:00    Main Document
Pg 14 of 35

G.      **The Chapter 11 Cases and the Plan**

24.     On July 27, 2023 (the "Petition Date"), the P.A. Debtors and certain other affiliated entities (the "Voyager Debtors"), filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Court").

25.     On August 4, 2023, the Voyager Debtors filed their *Joint Chapter 11 Plan of Voyager Aviation Holdings, LLC, et al.* [Dkt. No. 50] (the "Plan") and their *Disclosure Statement for Joint Chapter 11 Plan of Voyager Aviation Holdings, LLC ET AL.* [Dkt. No. 51] (the "Disclosure Statement").

26.     In the Plan, the Voyager Debtors do not explain in any meaningful detail the proposed treatment under section 1129(b) of the Bankruptcy Code for the Secured Parties if the AFIC Insurers do not execute an AFIC Consent Agreement—which is defined as a "Participation Consent" in the Plan. The claims arising from the Secured Obligations are classified in "Class 3b—Aircraft Financing Facility Claims against Participation Debtors." *See* Plan § II.C.4.[4] Class 3b claims are proposed to receive the follow treatment:

> **Treatment**. In the event a holder of an Allowed Class 3b Claim has executed a Participation Consent (or otherwise agreed to a proposed treatment with the Debtors, but subject to the terms of the Participation Agreement) each such holder shall receive the treatment provided in such Participation Consent or agreement. ***In the event a holder of an Allowed Class 3b Claim has not executed a Participation Consent, and has not otherwise agreed to a proposed treatment with the Debtors, then such holder shall receive treatment that satisfies section 1129(b) of the Bankruptcy Code.***

---

[4]     In addition to the secured claims under the Facilities, the Secured Parties also hold general unsecured claims against VAH on account of the guaranties under the Facilities and potentially unsecured deficiency claims against the Participation Debtors that are obligors under the Facilities.

Plan § II.C.4.b (emphasis added). The Plan does not specify how they will attempt to meet the section 1129(b) "cramdown" standard.

**H.    The Participation Agreement and the Motion**

*i.    The Participation Agreement*

27.    P.A. Debtors VAH and Voyager Aviation Management Ireland DAC ("VAMI") and Azorra entered into the Participation Agreement on July 17, 2023, ten days prior to the Petition Date. Subsequently, but also prior to the Petition Date, each of the Panamera Debtors and the Aetios Debtors executed joinders and became parties to the Participation Agreement. Motion ¶ 12. Under the Participation Agreement, the P.A. Debtors have agreed to sell to Azorra the "Participation Interests" in the "Participation Assets", as defined in the Participation Agreement. As recognized by the P.A. Debtors, all of the Participation Assets form part of the Collateral securing the Secured Obligations. Motion ¶ 24.

28.    The Participation Agreement grants Azorra the option, in its discretion, to "elevate" its purchase of the Participation Interests into a "direct assignment" to it from the P.A. Debtors of all of their rights, title and interest in the Participation Assets—i.e. an outright purchase of the Collateral. Participation Agreement § 4(a).

29.    The transfer of the Participation Interests and any subsequent transfer of the Participation Assets to Azorra is conditioned on, among other things, this Court's approval of the relief sought in the Motion and the entry into, and effectiveness of, an "AFIC Consent Agreement." Participation Agreement §§ 2(b)(i)(a)-(b). An AFIC Consent Agreement is defined in the Participation Agreement as "an agreement to be entered into between, among others, the Participants, VAH, VAMI and the applicable controlling Finance Parties on terms mutually agreeable to the parties thereto." Participation Agreement § 1(a) (definition of "AFIC Consent Agreement"). As discussed above, the AFIC Insurers are collectively the "applicable controlling

11

Finance Parties" referred to in the Participation Agreement and their consent is required for entry

into an AFIC Consent Agreement.

30.     As consideration for the purchase of the Participation Interests and a later transfer

of the Participation Assets at Azorra's option, Azorra has agreed to pay the P.A. Debtors *de*

*minimis* upfront consideration of one dollar ($1.00). Participation Agreement § 2(d). In addition,

the P.A. Debtors and Azorra have agreed to an allocation of proceeds of recoveries from the

Collateral that provides that all such proceeds—if any—shall be applied first to the repayment in

full in cash of the outstanding balance of the Secured Obligations owing to the Secured Parties.

Participation Agreement § 3(c). Following repayment of the Secured Obligations, Azorra is

entitled to recover its Participant Investment Amount (essentially all amounts expended by Azorra

in connection with the collateral recovery efforts), *plus* $10 million before any proceeds are

payable to the P.A. Debtors in the agreed waterfall. Participation Agreement § 3(c)(i)-(vi). At that

point, VAMI is entitled to the next $10 million in proceeds, followed by a payment of an amount

equal to the Participant Investment Amount (again), following which the parties agree to allocate

collateral proceeds on an 80/20 basis, with 80% of all such proceeds payable to Azorra and 20%

payable to VAMI. *Id.*

31.     Immediately upon the sale of the Participation Interests, Azorra will be vested with

complete, albeit indirect, control over the Participation Assets. Specifically, the Participation

Agreement provides that:

> a.   following the transfer of the Participation Interests the P.A. Debtors may take no
>      actions with respect to the Participation Interest and/or the Participation Assets
>      without first obtaining explicit Directions from Azorra (Participation Agreement
>      §§ 3(d)(i), 3(h));
>
> b.   Azorra is authorized to issue Directions to the P.A. Debtors to act, or to refrain from
>      acting, in respect of the Participation Interest and/or Participation Assets and the
>      P.A. Debtors are obligated to so act, or refrain from acting, upon receipt of Azorra's
>      Direction (Participation Agreement § 3(d)(ii));

c.  Azorra may decide, in its discretion, whether to "take any action (or refrain from taking any action) regarding how and whether or not to preserve, protect, or maximize the value of the Participation Interests or any Aircraft Recoveries or Insurance Recoveries…." (Participation Agreement § 3(d)(vii)(a)); and

d.  Azorra is explicitly authorized to act in its own self-interest (Participation Agreement § 3(d)(vii)(a)).

32.    The P.A. Debtors are using the Participation Agreement, and their delegation of control of the Participation Assets to Azorra as provided therein, as a substitute for their duties to protect the Collateral and refusing to provide fulsome information and time sensitive information to the AFIC Insurers regarding recovery and preservation efforts. For example, the P.A. Debtors recently refused to commit to funding the legal fees of insurance counsel to prepare a critical response brief in the UK Insurance Litigation, despite a quickly approaching deadline. It was only after Azorra agreed to put forward the funds and instructed the P.A. Debtors to do so that the P.A. Debtors instructed insurance counsel to proceed with the necessary preparations. *Id*. The P.A. Debtors have also informed the AFIC Insurers that they cannot contact insurance counsel handling the UK Insurance Litigation directly for updates on the process and that they are limiting the information that is being shared with the AFIC Insurers to comply with their reading of their confidentiality obligations under the Participation Agreement. *Id*. However, the P.A. Debtors do not have a contractual right under the Financing Documents or the Secured Documents to assign or delegate to a third party their rights and obligations to the Secured Parties thereunder, and there is no justification at all to withhold information from the Secured Parties in relation to the status of the Collateral.

33.    In both the participation and elevation scenarios, the P.A. Debtors represent that the Participation Assets will remain subject to the Secured Parties' liens and security interests, unless the Secured Parties have agreed otherwise. Motion ¶ 55. The "elevation" provisions of the

Participation Agreement do not make clear, however, that an elevation of the participation into an outright sale of the Collateral will be subject to the continuation of the Security Trustee's liens and security interests in the Collateral absent its consent to alternative treatment. Participation Agreement § 4(b). Further, the P.A. Debtors' proposed order granting the Motion (the "Proposed Order") purports to authorize the transfer of the Participation Interests free and clear of all liens, claims and encumbrances, subject only to the terms of the Participation Agreement, which as noted does not clearly provide that the Security Trustee's liens and security interests ride through. Motion, Exhibit Z (Proposed Order) ¶ 12. Even on the assumption that notwithstanding the drafting in the Participation Agreement and Proposed Order the P.A. Debtors mean what they say in the Motion, there is no clarity whatsoever in the Motion, the Participation Agreement or the Proposed Order on what terms the liens and security interests will continue to apply, including what debt service the Secured Parties will receive or what remedies they will be entitled to exercise in the event Azorra does not make or cause the P.A. Debtors to make ongoing debt payments or preserve the Collateral. On the other hand, the Participation Agreement makes crystal clear that absent Azorra providing directions to the P.A. Debtors to authorize or request payment of the Secured Obligations, Azorra "shall incur no liability under [the Participation Agreement] with respect to payment or non-payment of any Secured Obligations…." Participation Agreement § 2(c).

34.    The Participation Agreement further provides that in the event the P.A. Debtors sell all or any part of the Participation Interests or Participation Assets to a party other than Azorra, the P.A. Debtors will pay to Azorra a $2.5 million penalty (the "Penalty"). Participation Agreement § 20(e). Payment of the Penalty, subject to approval by this Court, is afforded administrative expense priority under sections 503(b) and 507(a)(2) of the Bankruptcy Code and the obligation to pay survives termination of the Participation Agreement, *including* as a result of the relevant parties' failure to enter into an AFIC Consent Agreement. Participation Agreement § 13(a)(ii). Unless an

AFIC Consent Agreement has been entered into, the Participation Agreement will terminate automatically by its terms on September 15, 2023 (as may be extended by the parties, the "Termination Date"). Participation Agreement §§ 1(a) (definition of "Termination Date"); 13(a).

35.     By its terms, the Participation Agreement may be amended in writing. Participation Agreement § 22(f).[5] Prior to an elevation of its participation in the Participation Interests into an outright purchase of the Participation Assets, Azorra may unilaterally terminate the Participation Agreement at its option at any time. Participation Agreement § 13(c).

### ii.     The Motion and the P.A. Debtors' Pre-Petition Marketing and Sale Efforts

36.     The AFIC Insurers learned of the terms of the Participation Agreement on the Petition Date only after it was described in and attached as an exhibit to the First Day Declaration. AFIC Decl. ¶ 20. Seven days later, the P.A. Debtors filed the Motion, seeking: (i) authority to assume the Participation Agreement; (ii) authority to consummate the sale of the Participation Interests and—at Azorra's later election—the Participation Assets upon satisfaction of relevant conditions precedent, including entry into an AFIC Consent Agreement; and (iii) immediate approval of the P.A. Debtors' agreement to pay the Penalty. Even though the AFIC Insurers' consent is essential to proceeding with the transactions contemplated by the Participation Agreement (the "Proposed Transactions"), neither the P.A. Debtors nor Azorra made any effort prior to the Petition Date or the filing of the Motion to engage with the AFIC Insurers on the terms upon which they would be prepared to consent. *Id*.

37.     As described in the First Day Declaration, the Motion and the declaration of Vinod Chandiramani (the "Chandiramani Declaration") [Dkt. No. 43], who is a Managing Director at

---

[5]     However, the proposed order granting the relief requested in the Motion provides that any amendment to the Participation Agreement that would have a material adverse effect on any of the P.A. or their estates or any of the Secured Parties would require approval by the Court upon appropriate notice in the circumstances. Motion, Exhibit Z (Proposed Order) ¶ 15.

Greenhill & Co., Inc. ("Greenhill") that leads Greenhill's engagement with the P.A. Debtors as their proposed investment banker, the P.A. Debtors engaged in exhaustive efforts prior to the Petition Date to market and sell the Participation Assets, first independently and later with the assistance of Greenhill. These included efforts to sell the Participation Assets as part of a broader sale transaction involving substantially all of the Voyager Debtors' assets, as well as on a standalone basis. Chandiramani Declaration ¶ 9; First Day Declaration ¶ 77. Efforts to sell the Participation Assets on a standalone basis involved Greenhill contacting 30 prospective investors, of which nine executed nondisclosure agreements and received access to a data room that included information regarding the Aircraft Insurances and potential litigation recovery scenarios. Chandiramani Declaration ¶¶ 8-9.

38.     Ultimately, however, no bids were received by the P.A. Debtors in connection with their or Greenhill's efforts that ascribed value to the Participation Assets in excess of the Secured Obligations and, on that basis, none were determined to be actionable by the P.A. Debtors. Chandiramani Declaration ¶ 9; First Day Declaration ¶ 77.[6]

---

[6]     Following the Petition Date, the Debtors filed the *Debtors' Supplemental Motion for Entry of Orders (i)(a) Approving Bidding Procedures, (b) Scheduling an Auction and Sale Hearing and Approving Form and Manner of Notice Thereof, (c) Approving Assumption and Assignment Procedures and Form and Manner of Notice Thereof, and (d) Granting Related Relief and (ii)(a) Authorizing the Sale of Substantially All Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, and (b) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases* [Dkt. No. 124], which, among other things, sought the Court's approval of bidding procedures to govern the proposed sale process for substantially all of the Debtors assets (the "Bidding Procedures"). Although initially potentially subject to the Bidding Procedures, the Debtors agreed, and confirmed on the record of the hearing to approve the Bidding Procedures, that the Participation Assets would not be available for sale under the Bidding Procedures. *See Order (A) Approving Bidding Procedures, (B) Scheduling an Auction and Sale Hearing and Approving Form and Manner of Notice Thereof, (C) Approving Assumption and Assignment Procedures and Form and Manner of Notice Thereof, and (D) Granting Related Relief* [Dkt. No. 148].

## **OBJECTION**

I.    **The Motion Is Premature and May Become Moot; Assumption of the
      Participation Agreement Is Not a Valid Exercise of the P.A. Debtors'
      Business Judgment**

39.    The P.A. Debtors have expended substantial resources on the Participation
Agreement, which they report is the product of extensive negotiations with Azorra following the
P.A. Debtors' and Greenhill's failure to identify an "actionable" bid of the Participation Assets.
And even though the P.A. Debtors concede that the Proposed Transactions cannot be effectuated
without the AFIC Insurers' consent, they made no effort to reach agreement with the AFIC Insurers
prior to their entry into the Participation Agreement or the filing of the Motion. Given the absence
of any meaningful commitments on Azorra's part and without any prospect of obtaining the AFIC
Insurers' consent to the current proposal, the only purpose served by the Motion is to ensure
approval of the Penalty so that it becomes payable when the P.A. Debtors turn to alternatives to
dispose of the Collateral in accordance with the Bankruptcy Code.

40.    The Motion is premature because it seeks approval of transactions that have no
hope of consummation without the AFIC Insurers' consent. Since the Petition Date, the AFIC
Insurers have engaged in exhaustive negotiations with the P.A. Debtors and Azorra. However, they
cannot agree to the Proposed Transactions as currently structured and it is highly prejudicial to the
interests of all parties in interest in these chapter 11 cases for the P.A. Debtors to pursue approval
of the Motion and to assume the obligation to pay the Penalty. As such, the P.A. Debtors' request
to assume the Participation Agreement and approve the Penalty in exchange for nothing of value
is not a valid exercise of their business judgment and is at odds with their duties under the
Bankruptcy Code.

41.    Courts use the "business judgment" standard when evaluating whether to permit a
debtor to assume or reject a contract. *In re Times Sq. JV LLC*, 648 B.R. 277, 284 (Bankr. S.D.N.Y.

17

2023) (citing cases). "This standard…presupposes that the estate will assume a contract only where doing so will be to its economic advantage and will reject contracts whose performance would benefit the counterparty at the expense of the estate." *In re Penn Traffic Co.*, 524 F.3d 373, 383 (2d Cir. 2008). However, courts play a critical role in testing a debtor's conclusion as to whether a proposed assumption or rejection would be beneficial or burdensome to the estate. *See, e.g.*, *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993) ("…[T]he process of deciding a motion to assume is one of the bankruptcy court placing itself in the position of the…debtor-in-possession and determining whether assuming the contract would be a good business decision or a bad one.") To assist the court in this task, a debtor seeking to assume or reject a contract must present evidence of benefit or burden sufficient to justify its decision. *In re MF Glob. Holdings Ltd.*, 466 B.R. 239, 242 (Bankr. S.D.N.Y. 2012) (holding that debtor seeking to reject executory contract must support its motion with evidence demonstrating that rejection falls within the proper exercise of the debtor's business judgment).

42.     While the bar for approval of a debtor's decision on assumption is undoubtedly low, this is the rare case where a debtor fails to clear it. There is no rational justification for the P.A. Debtors' decision to assume the Participation Agreement in light of the AFIC Insurers' refusal to consent. Authorizing the assumption now would only serve to obligate the P.A. Debtors to pay a $2.5 million Penalty to Azorra when the P.A. Debtors inevitably turn to either disposing of their interests in the collateral under sections 363 or 1129 of the Bankruptcy Code or outside the strictures of the bankruptcy process through an AFIC Insurer-led foreclosure. There is no benefit to the estates in that result. The P.A. Debtors, however, attempt to justify assumption by arguing on the one hand that if the Participation Agreement is not assumed they "face the material risk of losing all value associated with the Participation Assets" and on the other hand that if the AFIC Insurers do not consent the agreement will terminate "and the P.A. Debtors and the Finance Parties

(and all other creditors) will [be left] with the same rights as they currently possess." Motion ¶ 35. The first argument only makes clear that the AFIC Insurers' interests are not adequately protected, as discussed in detail below, and the second argument is patently false: when the Participation Agreement terminates because the AFIC Insurers refuse to consent unsecured creditors of the P.A. Debtors, including potentially the Secured Parties to the extent of any deficiency claims, will stand behind $2.5 million in administrative expenses on account of the Penalty.

43.    Given the AFIC Insurers' position that they will not consent to the Proposed Transactions, the P.A. Debtors cannot demonstrate that assumption would be beneficial to their estates and as such the Motion should be denied.

## II.    The Sale of the Participation Assets Does Not Satisfy the Requirements of Sections 363(f) and 363(k) of the Bankruptcy Code

44.    The P.A. Debtors and Azorra have structured the Proposed Transactions to proceed in two stages. At the first stage, the P.A. Debtors purport to sell, upon the satisfaction of various conditions precedent, including entry into an AFIC Consent Agreement, all of their interests in the Participation Interests to Azorra. The P.A. Debtors are at pains to make clear that they **_are not_** at this initial stage transferring the Participation Assets themselves because they cannot do so without the consent of the Secured Parties, as directed by the AFIC Insurers. Motion ¶ 24.

45.    However, the P.A. Debtors also seek pre-authorization to transfer the Participation Assets **_in the future_**—for no additional consideration—upon the occurrence of an "Acceptance Election"—that is an election by Azorra in its sole and absolute discretion to elevate its purchase of the Participation Interests into an outright purchase of the Participation Assets. Participation Agreement §4(a)-(b). While the P.A. Debtors represent in the Motion that they are not seeking to transfer any property free and clear of the liens and security interests securing the Secured Obligations absent obtaining the Secured Parties' consent to such a sale, that

19

representation is not consistent with the operative provisions of the Participation Agreement and the Proposed Order, which appear to authorize the subsequent transfer of the Collateral free and clear of the Secured Parties' liens and security interests without making any effort to comply with either section 363(f) or 363(k) with respect to that proposed *ex post* transfer.

46.     Because the Secured Parties maintain first-priority liens and security interests in the Participation Assets, their transfer pursuant to section 363 of the Bankruptcy Code must comply with sections 363(f) and 363(k) as to the Secured Parties. Here, the Secured Parties do not consent to the sale of the Participation Assets free and clear of their liens and security interests and the P.A. Debtors can point to no other basis under section 363(f) to authorize a free and clear transfer. Further, the Secured Parties are provided no opportunity to exercise their rights to credit bid under section 363(k) of the Bankruptcy Code, which rights may only be limited for "cause", such as evidence of inequitable conduct. 11 U.S.C. § 363(k); *In re Aéropostale, Inc.*, 555 B.R. 369, 414 (Bank. S.D.N.Y. 2016) (denying chapter 11 debtors' motion seeking to limit creditor's ability to credit bid); *In re RML Development, Inc.*, 528 B.R. 150, 156 (Bankr. W.D. Tenn. 2014) (holding that a secured party's right to credit bid should only be modified or denied on a showing of inequitable conduct and that "such a modification or denial should be the extraordinary exception and not the norm.").[7] There is no cause to limit the Secured Parties' rights here.

47.     The Court should decline any invitation to authorize the sale of property of the P.A. Debtors' estates at a later date in a manner that the P.A. Debtors concede they cannot accomplish today—the passage of time does not make the Secured Parties' rights under the Bankruptcy Code

---

[7]     Given the clear conclusion of the market that the P.A. Debtors have no equity in the Participation Assets, any credit bid by the Secured Parties would likely result in their acquiring the Participation Assets at an amount equal to or less than their claims—i.e. on a cashless basis. While that outcome may be unwelcome to the P.A. Debtors, it is, as demonstrated by the P.A. Debtors' own evidence, the present reality of the market for the Participation Assets and a vague hope for future equity value is no justification for depriving a secured party of rights to its collateral.

any less absolute than they are at present and the P.A. Debtors' hope for some potential upside

recovery years in the future is no justification to disregard those rights today.

### III.  **The Secured Parties' Interests Are Not Adequately Protected**

48.    Section 363(e) provides in relevant part:

> [n]otwithstanding any other provision of this section, at any time, on
> request of an entity that has an interest in property used, sold, or
> leased, or proposed to be used, sold or leased, by the trustee, the
> court, with or without a hearing, shall prohibit or condition such use,
> sale, or lease as is necessary to provide adequate protection of such
> interest.

11 U.S.C. § 363(e).

49.    The requirement of adequate protection in section 363(e) is mandatory. *In re*

*Metromedia Fiber Network, Inc.*, 290 B.R. 487, 491 (Bankr. S.D.N.Y. 2003) ("Section 363(e) is

not permissive or discretionary—it states that the court 'shall' grant the relief specified, at any

time, on request of the secured entity") (internal citations omitted). "If adequate protection cannot

be provided to a secured party, the proposed use, sale, or lease of collateral ***must*** be prohibited."

*Id*. (emphasis added); *see also In re Dewey Ranch Hockey, LLC*, 414 B.R. 577, 592 (Bankr. D Ariz

2009) (emphasis added) (finding that the requirement of adequate protection is mandatory and if

adequate protection cannot be provided, a sale under § 363(e) must be prohibited).

50.    While the Bankruptcy Code does not define "adequate protection," courts make

clear that a secured party is entitled under both 363(e) and the corollary provision section 362(d)

to protection from diminution in the value of the secured party's interest in property of the debtor's

estate due to the imposition of the automatic stay and/or as a result of the debtor's use, sale, or

lease of such property. *In re Wythe Berry Fee Owner LLC*, 22-11340 (MG), 2023 WL 2483427,

at *5 (Bankr. S.D.N.Y. Mar. 13, 2023) ("The critical purpose of adequate protection is to safe

guard the secured creditor's collateral during the period when the debtor-in-possession is using the

collateral") (citations omitted). What is "adequate" is fact and circumstances dependent, but upon request of such protection it is the debtor's burden to demonstrate that it is being provided. *See, e.g.*, *Sonnax Indus., Inc. v. Tri Component Prod. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1285 (2d Cir.1990)("Section 362(g) places the burden of proof on the movant for all other issues other than 'the debtor's equity in property'"); *In re YL W. 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) (same). Further, section 361 of the Bankruptcy Code provides a non-exhaustive list of potential forms of adequate protection, including (a) periodic cash payments, (b) additional or replacement liens, and (c) such other relief as will provide the "indubitable equivalent" of the security party's interest in the debtor's property. 11 U.S.C. § 361.

51.    Here, the Secured Parties have been provided with no adequate protection. ***First***, the P.A. Debtors admit that they lack the resources to adequately protect the Secured Parties' interests in the Collateral stating that "if the Participation Transaction Documents are not assumed, the Panamera Debtors face the material risk of losing all value associated with the Participation Assets" and "[g]iven the lack of cash flows and limited liquidity of the [Panamera Debtors and the Aetios Debtors], there is a material risk that the Participation Assets will deteriorate absent a source of financing to satisfy the Secured Obligations…." *See* Chandiramani Decl. ¶¶ 17-18.

52.    The inability of the P.A. Debtors to secure a committed source of funding for the Insurance Litigation creates a high likelihood of a substantial or total loss of that Collateral's value. In fact, the P.A. Debtors have admitted that there is:

> insufficient liquidity at the [Panamera Debtors and the Aetios Debtors] to fund the various obligations that are coming due on account of the Participation Assets, which obligations include servicing the Secured Obligations, paying litigations costs and expenses associated with pending litigation with respect to the reinsurance claims, pursuing the claims and potential litigation on the contingent policy insurance claims and other costs in pursuing the Participation Assets and recoveries on the Aircraft.

*Id*. ¶ 24. The P.A. Debtors recently refused to commit to funding the legal fees of insurance counsel to prepare a critical response brief due to be filed in the UK Court by August 25, 2023, until Azorra agreed to fund the expenses, thereby risking irreparably damaging the prospects for recovery in the Insurance Litigation. AFIC Decl. ¶ 22. The P.A. Debtors' complete lack of available financial resources to prosecute the Insurance Litigation puts that potentially valuable asset, the Secured Parties' primary prospective source of repayment, in perpetual peril. *Balco Equities*, 312 B.R. at 751 (finding a lack of adequate protection where "[t]he Debtors have no means of paying for the constant maintenance required to sustain seagoing vessels, including provision of a crew and the supplies necessary for their sustenance").

53.    Acknowledging this dire reality, the P.A. Debtors have instead represented that they are relying on Azorra, which they describe as the only "actionable" liquidity source for potentially maintaining the value associated with the Participation Assets, to fund the Insurance Litigation.[8] Motion ¶ 19. For its part, Azorra may, or may not, in all cases in its sole and absolute discretion, act in connection with collateral recovery efforts as it sees fit and with regard to its interests alone. At the same time, it makes no commitment and is under no obligation to provide any funding as may be required to preserve the Participation Assets, let alone to ensure that appropriate steps are taken, particularly in the prosecution of the pending UK Insurance Litigation (and future litigation in respect of the Contingent Insurances), to protect the Secured Parties' interests. Rather, it is left entirely to Azorra's discretion to determine how, when and whether to act in relation to the Insurance Claims, including whether to settle and for what recovery. That the P.A. Debtors have abdicated control over the preservation and realization of the Secured Parties' Collateral to a party

---

[8]    In fact there is an actionable way forward, in or out of bankruptcy, and in the circumstances of these cases it is the only way to provide even a modicum of protection of the Secured Parties' interests—permit the Secured Parties to foreclose on their interests under applicable non-bankruptcy law to mitigate the diminution in the value of their Collateral or otherwise promptly sell the Collateral pursuant to section 363 of the Bankruptcy Code and afford the Secured Parties their statutory right to credit bid their claims pursuant to section 363(k).

with no obligation to undertake those responsibilities or repay the Secured Obligations in their stead is hard to comprehend and strong evidence of a lack of adequate protection.[9]

54.     Further, the AFIC Insurers are gravely concerned regarding the large outstanding amounts owing and the ongoing accrual of costs in relation to the storage and maintenance of the Engine at the Taiwan Shop. In light of the already sizeable amounts owing to the Taiwan Shop, which are presumably increasing every day due to late payment and ongoing storage charges, all of which will be secured by materialman's liens, the near term disposition of the Engine in a value maximizing transaction is essential and should be pursued as soon as practicable to prevent further value erosion. In addition, it is essential to confirm that there is no risk of the Taiwan Shop taking steps to dispose of the Engine on account of asserted materialman's liens. Notwithstanding the AFIC Insurers' repeated requests for information with respect to the P.A. Debtors' proposed course of action in relation to the Engine, to date the AFIC Insurers have no clarity at all as to how the P.A. Debtors intend to proceed, the maintenance and storage conditions in the Taiwan Shop or how their interests in the Engine will be protected. *Id*. Rather, the P.A. Debtors appear unwilling or unable to take appropriate steps to mitigate against the diminution in the value of the Secured Parties' security interests and liens in the Engine and seem to be content to merely sit back and wait for the AFIC Insurers to take steps to force the issue. Thus, it is clear that the P.A. Debtors cannot be trusted to adequately protect the Collateral.

55.     ***Second***, the prospect that the AFIC Insurers will receive proceeds from the prosecution of the Insurance Claims at some point in the future is insufficient to provide adequate

---

[9]      The main thrust of the Proposed Transactions is to prevent the Secured Parties, who are at risk of suffering first losses in excess of $125.7 million, from exercising rights to dispose of the Participation Assets to preserve an outside chance of a return in excess of the Secured Obligations at some point in the future and without regard to the Secured Parties' interests—in other words, rather than protecting the Secured Parties' interests the Proposed Transactions would have the Secured Parties stand by as passive bystanders while Azorra gambles with their Collateral.

protection. *See Rocco v. J.P. Morgan Chase Bank*, 255 Fed. App'x. 638, at *2 (3rd Cir.2007)

(finding speculative offer of adequate protection relating to litigation outcome is not sufficient);

*In re Turner*, 326 B.R. 563, 577–78 (Bankr.W.D.Pa.2005) (same); *see also In re Mosello*, 195 B.R.

277, 292 (Bankr.S.D.N.Y.1996) (denying motion to permit Chapter 11 debtor to borrow $350,000

by granting lender a lien that would prime that of undersecured creditor because speculative benefit

to undersecured creditor did not constitute adequate protection); *In re Ziegler*, 88 BR 67, 70 (Bankr

ED Pa 1988) (holding that the pledge of proceeds from contingent, unliquidated state court lawsuit

was insufficient to provide adequate protection to holder of second mortgage on debtor's

residential real property as "the lawsuit is an economic intangible; neither recovery nor the amount

of recovery can be ascertained."). Moreover, even if it is assumed that a future recovery will be

achieved in the Insurance Litigation, the Participation Agreement provides no commitment for

even the minimum funding needed to preserve and maximize the value of the Collateral and there

does not appear to be any other realistically available source of funding available to the P.A.

Debtors. There is, therefore, no path to achieving the prospective future recovery that they would

depend on as adequate protection, rendering its value as adequate protection even more dubious.

56.    ***Third***, there is no equity cushion here that may serve as a substitute for adequate

protection. The P.A. Debtors' own pre-petition marketing of the Collateral proves that the value

of the Collateral is not greater than the amount of the Secured Obligations. *See* Chandiramani Decl.

¶¶ 6-9. The P.A. Debtors went through two marketing processes and no party at any point

submitted a bid that valued the Participation Assets in excess of the amounts owing to the Secured

Parties. *Id*. Moreover, the Debtors have not indicated that the AFIC Insurers will be receiving any

distributions under the Plan, let alone payment in full. *See Elmira Litho, Inc.*, 174 B.R. 892, 904

(Bankr. S.D.N.Y. 1994) ("An equity cushion…provides adequate protection if it is sufficiently

large to ensure that the secured creditor will be able to recover its entire debt from the security at

the completion of the case.").

57.    Neither do the P.A. Debtors offer any alternative forms of adequate protection, whether in the form of monthly payments, replacement liens, expense reimbursement or something else. Indeed, by their own admission they have no the means to do so. Accordingly, under these circumstances the use and sale of the Collateral as contemplated by the Motion must be denied.[10]

## IV.    The $2.5 Million Penalty Should Not Be Approved; It Is Not Akin to Bid Protections

58.    By the Motion, the P.A. Debtors seek to encumber their cash-strapped estates— which in the case of the Panamera Debtors and the Aetios Debtors lost their sole source of revenue following the total loss of the Aircraft in Russia—with a further $2.5 million contingent liability as so-called "Liquidated Damages" (the "Penalty"). *See* Participation Agreement § 20(e); Motion ¶¶ 56-62. By its terms, the Penalty is payable to Azorra upon the occurrence of an "Alternative Transaction," which is defined under the Participation Agreement as a sale of "any of the Participation Assets (as approved by the Bankruptcy Court) to any other person or entity other than the Participants or under a transaction consented by the Participants (such sale to such other person or entity that is not consented to by the Participants)...." Participation Agreement § 20(e).

_____

[10]    To the extent the P.A. Debtors argue the transfer of the Participation Interests need not be conditioned on the provision of adequate protection to the Secured Parties because the Secured Parties' interests are limited to security interests and liens in the Participation Assets, they are wrong. Transfer of complete control over the Participation Assets through directions provided by Azorra to the P.A. Debtors, including the ability to take, or not take, whatever action Azorra considers appropriate in connection with the prosecution of the UK Insurance Litigation, is certainly "use" of the Collateral within the meaning of the Bankruptcy Code. *See, e.g.*, *In re Lavigne*, 114 F3d 379, 385 (2d Cir 1997) (cancellation of medical malpractice policy "use" within meaning of section 363); *see also* 3 Collier on Bankruptcy P 363.02 (16th ed. 2023) ("Section 363(b) has been applied to other uses that one might not ordinarily posit as a question of use of property, but rather as entering into transactions out of the ordinary course of business"). And even if this Court were to determine that complete control over the Collateral does not constitute "use" within the meaning of Section 363(e) (which it clearly does), the Motion seeks authorization of the "sale" of the Collateral upon "elevation." While the sale of the Participation Interests is a sale of the Participation Assets by another name, the future sale of the Participation Assets upon an Acceptance Election is indisputably a "sale" that requires the provision of adequate protection of the Secured Parties' interests pursuant to section 363(e) of the Bankruptcy Code.

59.     The obligation to pay the Penalty, unlike the sale of the Participation Interests and right to make an Acceptance Elevation, would be ***immediately effective*** upon the Court's approval of the P.A. Debtors' assumption of the Participation Agreement and enforceable against the P.A. Debtors upon a later disposition of the Participation Assets. The obligation is ***not*** conditioned on the parties' entry into the AFIC Consent Agreement and it survives termination of the Participation Agreement. Participation Agreement § 13(a)(ii). This means that if the Penalty is approved by this Court, when the Participation Agreement terminates on September 15, 2023, as a result of an the parties' failure to enter into an AFIC Consent Agreement, the Penalty will be payable if any of the Participation Assets are later sold, either in whole or in part, by the P.A. Debtors, or in any transaction consented to by the P.A. Debtors, at any point in the future. This appears to capture a credit bid by the Secured Parties pursuant to section 363(k) or a foreclosure under non-bankruptcy law.

60.     The P.A. Debtors attempt to justify the Penalty by arguing that it is similar to a "bid protection." At the same time, they characterize the Penalty as a "fee" in recognition of Azorra's willingness to enter into the Participation Agreement. *See* Motion ¶ 58. However, the P.A. Debtors have failed to articulate why such a fee or "bid protection" in relation to the Proposed Transactions is necessary or appropriate in the context of a private sale where there is no prospect for a higher offer and given the AFIC Insurers' position no prospect of the Proposed Transactions being consummated. This is because there is no rational economic justification for the Penalty. Bid protections are not appropriate in this context because unlike a stalking horse bidder that sets the floor price for assets in connection with a public sale that is designed to identify the highest and best offer for those assets, Azorra is providing no value to the P.A. Debtors other than a highly speculative prospect of some allocated recovery of value from the Participation Assets in excess

of the Secured Obligations.[11]

61.    The Penalty is also unjustifiable as "Liquidated Damages," as the P.A. Debtors refer to it. Liquidated damages under New York law, which is the governing law of the Participation Agreement, are "an estimate, made by the parties at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement." *See Trustees of Columbia University in City of New York v. D'Agostino Supermarkets, Inc.*, 36 N.Y. 3d 69, 74-5 (2020) (holding that liquidated damages authorized by surrender agreement were grossly disproportionate to harm from breach, and thus constituted an unenforceable penalty). Liquidated damages are ***not*** enforceable under New York law if they constitute a penalty, and thus, violate public policy. *Id.* at 75. A liquidated damages provision constitutes a penalty if it contemplates damages that are "grossly disproportionate to the amount of actual damages." *Id.*

62.    Here, the Penalty is not triggered by a breach at all—it is payable in connection with a later disposition of the Participation Assets if Azorra terminates the Participation Agreement at ***Azorra's*** option or if it terminates automatically by its terms following the parties' failure to enter into an AFIC Consent Agreement. Even if the Penalty was payable upon breach, it has no reasonable relationship to damages. The P.A. Debtors go so far to assert that the Penalty is "in an amount that is reasonable in respect of the Purchase Price and the liabilities and obligations to which the Participation Assets remain subject." Motion ¶ 61. But the Purchase Price is only $1.00, Participation Agreement, 10 (definition of "Purchase Price"), and Azorra is not assuming the Secured Obligations. *Id.* § 5. As such, $2,500,000 is in fact grossly disproportionate to the amount of damages Azorra would suffer if there was a breach.

---

[11]    Further, the P.A. Debtors have already concluded their marketing efforts so there is no prospect of higher, better offers in connection with which Azorra should be rewarded for an opening offer and diligence. As such, the Penalty stands only as a drag on the value of the Participation Assets following the pre-ordained termination of the Participation Agreement as a result of the failure of the parties to enter into an AFIC Consent Agreement.

63.    The Penalty serves only two purposes: (1) to impose a pecuniary obligation on the P.A. Debtors if the Proposed Transactions are not consummated; and (2) to provide Azorra with a potential windfall. As such, the Penalty is unenforceable under New York law and should not be approved.[12]

## V.    The Proposed Order Requires Certain Clarifications/Additions

64.    If the Court determines to grant the Motion over the AFIC Insurers' objections, the AFIC Insurers respectfully submit that at a minimum certain clarifications are required with respect to the Participation Agreement and the Proposed Order.

65.    *First*, it is clear that the P.A. Debtors intend that the waterfall set forth in the Participation Agreement to provide for the payment in full in cash of the Secured Obligations. The definition of "Secured Obligations" as used in the Participation Agreement, however, does not necessarily cover all Secured Obligations as that term is defined in the Facilities. The Court should include language in the Proposed Order, or otherwise require appropriate amendments to the Participation Agreement, to make clear that the term "Secured Obligations" as used in the Participation Agreement has the same meaning given to that term under the Facilities.

66.    *Second*, while the P.A. Debtors represent in the Motion that the occurrence of the Participation Sale Date is conditioned on the entry into a AFIC Consent Agreement, and that representation is generally consistent with the relevant provisions of the Participation Agreement, the AFIC Insurers respectfully submit that in light of the importance of this issue additional

---

[12]    The AFIC Insurers do not consent to the Collateral being used to pay any part of the Penalty. Further, the Panamera Debtors and the Aetios Debtors are bankruptcy-remote SPVs without employees or assets other than the relevant Leases, which in light of Russia's continuing war against Ukraine and resulting sanctions are not generating revenue and are not expected to do so at any point in the future. Recovery of the Aircraft is not expected and as asserted in the Insurance Litigation the Debtors consider them to be a total loss. Given the nature of these P.A. Debtors' operations and the financial condition of their estates, the gratuitous layering of administrative expense has the likely result of rendering them administratively insolvent. The Court should not grant relief that would prejudice the estates in that manner. *See, e.g., In re Flour City Bagels, LLC*, 557 B.R. 53, 80 (Bankr. W.D.N.Y. 2016) (denying debtor's motion to sell substantially all its assets because the sale would have rendered it administratively insolvent).

confirmatory language should be added to the Proposed Order to remove any doubt that the need

for the AFIC Insurers' consent in the form of an AFIC Consent Agreement is an absolute and

non-waivable pre-condition to the P.A. Debtors' ability to transfer the Participation Interests.

## VI.    Request for Adequate Protection

67.    The AFIC Insurers, on behalf of itself and each of the other Secured Parties, hereby

request adequate protection of the Secured Parties' interests in the Collateral, which includes the

Participation Assets, pursuant to section 363(e) of the Bankruptcy Code.[13]

## RESERVATION OF RIGHTS

68.    The AFIC Insurers expressly reserve all rights, claims, defenses, and remedies,

including, without limitation, to supplement and amend this Objection, to raise further and other

objections to the Motion and to introduce evidence prior to or at any hearing on the Motion.

*[Intentionally left blank]*

---

[13]    To the extent the Court determines that the AFIC Insurers must make a motion for adequate protection under section 363(e), the hereby respectfully request that this Court treat this Objection as a motion for such relief.

## CONCLUSION

**WHEREFORE,** for the reasons set forth herein, the Court should deny the Motion.

Dated: September 7, 2023
New York, New York

*/s/ Daniel J. Guyder*
Daniel J. Guyder
Christopher R. Newcomb
Joseph Badtke-Berkow
Jacob R. Herz

**ALLEN & OVERY LLP**
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 610-6300
Facsimile: (212) 610 6399
daniel.guyder@allenovery.com
chris.newcomb@allenovery.com
joseph.badtke-berkow@allenovery.com
jacob.herz@allenovery.com

*Attorneys for Aircraft Finance
Insurance Consortium Insurers*